Steven SHELTON, Plaintiff–Appellant,

v.

The TRUSTEES OF INDIANA UNIVER-SITY, et al., Defendants–Appellees.

No. 88–2167.

United States Court of Appeals, Seventh Circuit.

Submitted Nov. 8, 1989.

Decided Dec. 8, 1989.

Steven Shelton, Titusville, Fla., pro se.

Albert J. Velasquez, Office of the University Counsel, Bloomington, Ind., for defendants-appellees.

Before CUDAHY, POSNER, and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

■ This is a suit under 42 U.S.C. § 1983 against the trustees of Indiana University, a public university, and others by a law student, Steven Shelton, who claimed that the university decided not to rehire him as a resident assistant in an Indiana University dormitory because he displayed an automatic rifle in his room as part of a political statement about the Vietnam War. The suit seeks both injunctive relief and damages, and is against the trustees in both their official and their personal capacity. After a bench trial, the district judge correctly dismissed the claim for damages against the trustees in their official capacity as barred by the Eleventh Amendment, *Kashani v. Purdue University,* 813 F.2d 843 (7th Cir.1987), and dismissed the rest of the suit on the ground that Shelton had been denied rehire "not because of this 'speech,' but because his behavior toward his supervisors was belligerent, insubordinate, and reflected a poor understanding of his role as a resident assistant." Unless this finding is clearly erroneous, the decision must stand.

Shelton, a Marine Corps veteran of the Vietnam War, had bought an AR–15 automatic rifle, which is similar to the M–16 that he carried in Vietnam, and displayed it in his dorm room—which was also his resident assistant's office—together with memorabilia of the war and his own personal statements regarding the Vietnam War and war in general. A photograph of the ensemble is reproduced at the end of this opinion.

University regulations forbid the possession of firearms, defined as "any weapon[s] ... designed ... to expel a projectile by means of an explosion." Shelton knew about the regulations and proposed to the head of the university's housing office that the bolt of the AR–15 be stored in the housing office. The manager of the office checked with an officer of the university's police department, who opined that without its bolt the AR–15 was not a firearm. Nevertheless, Shelton's immediate supervisor told Shelton that the entire rifle would have to be stored in the housing office.

Shelton responded with a somewhat testy letter in which he said that both the housing manager and the police force had "represent[ed] themselves as having (and ... undoubtedly do have) final say over, and superior knowledge of, firearms"; "nothing in my job description nor even in the unwritten rules that we live by ... requires me to surrender personal property by your command"; "please do not impose your personal bias or imported Massachusets [*sic*] gun control ideology on the rest of us"; and "any act to deprive me of my property [elsewhere described in the letter as 'this relic of war which I hold dear'] will be met with swift legal action."

The supervisor responded in a memo directing Shelton to store the rifle in the housing office. The memo explained that "your room is also your place of work. Expectedly, students come by RA rooms for advice, counseling, help and support. You conduct business on behalf of the University. Storage of or display of firearms is inappropriate. This has now become an employment issue. Your cooperation in this matter is fully expected. Failure to comply will result in review of your continued status as a Resident Assistant." To this Shelton replied: "The disabled AR–15, along with various other harmless Marine Corps equipment and photographs, constitute a political statement which I am entitled to make.... I like being an R.A. I like my AR–15 in my sight and well protected, too. The problem is not mine, but yours. You have created it. It is up to you to prove that I am in violation of some solid policy related to my job. Deprivation of private property or the use and enjoyment thereof does not constitute reasonable expectation of an employee by an employer without due compensation. Therefore leave me in peace and let me study. I mean no insubordination or disrespect." And in fact, despite his strong words, Shelton placed his gun in the housing office. But shortly after checking it in he became concerned about its safety, removed it from the office, and took it off campus. His supervisor, seeing from the records of the housing office that Shelton had checked the gun in and then out again in short order,

concluded that he was playing games with her and, without checking his room to see whether the gun was there, fired him.

Shelton appealed the dismissal to the director of residential services, who, after an informal hearing at which Shelton and others testified, decided not to fire him, but also not to rehire him for the next year. The Dean of Students ratified this decision.

■ If the university had decided not to rehire Shelton because it disagreed with his views on the Vietnam War or on the right to bear arms or on other political questions, it would have violated—prima facie, anyway—his rights under the First Amendment, made applicable to the states and their subdivisions by the Fourteenth Amendment. But there is no evidence of this. If, as is more plausible though not we think proved, the university had decided not to rehire him because it thought the display of a gun an inappropriate mode of "speech" in a university dormitory, we would have to decide whether such a curtailment of free speech violates the First Amendment. We do not have to reach that question, but we wish to make clear that we are not "ducking" it because we think the answer is yes. A public university does not violate the First Amendment when it takes reasonable steps to maintain an atmosphere conducive to study and learning by designating the time, place, and manner of verbal and especially nonverbal expression; and the principles of academic freedom counsel courts to defer broadly to a university's determination of what those steps are. *Piarowski v. Illinois Community College,* 759 F.2d 625 (7th Cir.1985). The display of an automatic rifle, in apparent although not actual working order, in the office of a university employee charged with offering advice and counsel to students, some of whom doubtless are anxious, agitated, homesick, depressed, or otherwise disturbed, does not strike us as conducive to the maintenance of a tranquil academic atmosphere. And to forbid the display *in that setting* seems unlikely to curtail the marketplace of ideas, since there are many other settings in which the gun could be exhibited without triggering the concerns that led the university to forbid its display in a dormitory room occupied by an employee of the university responsible for counseling students. Many of those settings, indeed, are not even under the university's jurisdiction.

■ But we need not decide the constitutional question. The correspondence from which we have quoted, and the events that we have narrated, provide enough support for the district judge's finding that Shelton was denied rehire as a resident assistant because the administration decided he was unsuitable for the position, quite apart from his desire to display a gun in his room, to prevent us from deeming the finding clearly erroneous. Of course the incident with the gun was the catalyst. But if the administration's reaction was not to the incident itself but to how Shelton handled it, which is the district judge's finding, then Shelton was not punished for exercising his claimed right of free speech.

Shelton's response to the incident consisted of words and of deeds. We start with the latter. After appearing to thumb his nose at his supervisor's order to remove the gun from his room, he finally did remove it. But when, shortly after checking it into the housing office, he checked it out again, he did not think to tell his supervisor what he was doing and as a result created the natural impression that he was defying her.

As to his words: He put it to his supervisor in his first response that the housing director and the police department were authorized to decide whether his AR–15 was a firearm within the meaning of the university's regulations; he attributed (with no basis so far as the record shows) the direction to store the gun to the supervisor's ideology; he threatened litigation. The letter fairly radiates contempt and defiance. His second letter is milder, but the comment that "I like my AR–15 in my sight" could be thought slightly ominous, as could the comment that "the problem is not mine, but yours."

We cannot say that *no* university administrator, even one who shared Shelton's political views and personally approved of

the place and manner in which he was seeking to present them, would have acted as the defendants did: would have thought that Shelton's words and deeds in relation to the supervisor's direction to remove the gun from his room warranted a decision not to rehire him. This is not to say a *reasonable* administrator would think this way; that is not the issue. Shelton had no federal right to be rehired; he had only a federal right not to be discriminated against for exercising constitutionally protected freedom of speech. The district judge found that these defendants thought Shelton insubordinate and therefore unsuitable, and if they did, it is irrelevant whether abler administrators would have thought differently or whether the defendants acted abruptly, insensitively, or unfairly. Shelton's manner was insubordinate, and many employers are intolerant of insubordinate employees. If he was fired for insubordination, he has no case. Cf. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

This can be made clear by supposing that instead of wanting to display a gun as part of a political statement, Shelton had wanted to keep an alligator in his bathtub, and the university's regulations were ambiguous as to whether this was permissible. Suppose Shelton had checked with the zoology department, which had no objection, but his supervisor directed him to get rid of the alligator anyway. And suppose that after that everything had unfolded just as it did in this case, ending in a decision not to rehire Shelton after his contract expired. Then it would be clear that he had been fired not because of an attempted exercise of rights under the First Amendment but because of real or imagined insubordination. This case is less clear only because a purported exercise of those rights kicked off the dispute that led to the words and conduct that the defendants construed as insubordinate.

The separation of permitted from forbidden motives by the methods of litigation is a subtle, perhaps frequently an impossible, task. The distinction between punishing an employee for exercising his constitutional rights and punishing him for being insubordinate in a dispute over the scope of those rights is analytically simple but empirically untractable. Nevertheless it is a task that the legal system has assigned to the triers of fact, and they will be reversed only when they perform it in a manner that we can say was clearly in error. We cannot say that here.

AFFIRMED.