**Albert J. VELASQUEZ, Plaintiff,**

**and**

**The United States of America, Intervenor,**

**v.**

**Dorothy J. FRAPWELL and the Trustees of Indiana University, Defendants.**

**No. IP 96–0557–C H/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 6, 1998.

Michael A. Kiefer, Garrison & Kiefer, Indianapolis, IN, for Plaintiff.

Carl E. Goldfarb, Department of Justice, Civil Division, Washington, DC, Tim A. Baker, Office of the United States Attorney, Indianapolis, IN, for Intervenor.

Susan B. Tabler, Ice Miller Donadio & Ryan, Indianapolis, IN, for all Defendants.

### ENTRY ON DEFENDANT'S MOTION TO DISMISS

HAMILTON, District Judge.

The Supreme Court's decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), has re-energized a " 'lively debate in judicial and academic circles' about issues of sovereign immunity." *Gorka v. Sullivan,* 82 F.3d 772, 774 (7th Cir.1996). The debate continues

here. The federal Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4311 *et seq.* ("USERRA"), prohibits discrimination in employment based upon an employee's membership or service in the uniformed services. See 38 U.S.C. § 4311(a). After Indiana University fired plaintiff Albert Velasquez from his position as associate university counsel, he sued the university for, among other claims, violating USERRA by discriminating against him on the basis of his service in the Indiana National Guard. The question presented here is whether the Eleventh Amendment to the United States Constitution bars a State employee from suing a State in federal court for violating the USERRA. The court concludes that the answer is yes. The Eleventh Amendment, as interpreted in *Seminole Tribe,* requires dismissal of plaintiff's USERRA claim for lack of jurisdiction.

## Background

Indiana University hired plaintiff Albert Velasquez as an associate university counsel in 1975. At roughly the same time, plaintiff joined the Indiana National Guard. During the course of his part-time service with the Indiana National Guard, Velasquez has served as an artillery officer, military lawyer, and chief military judge for the State of Indiana, and he has been a member and coach of the Indiana National Guard's winter and summer biathlon teams, as well as the military skills team. Pl. Aff ¶¶ 12, 16. Velasquez served both Indiana University and the Indiana National Guard until Indiana University terminated his employment in late 1995. That termination is the subject of this lawsuit.

In Count II of his First Amended Complaint, Velasquez alleges that Indiana University violated USERRA by terminating his employment based upon his service in the National Guard.[1] Defendants Dorothy Frapwell and the Trustees of Indiana University (collectively, "Indiana University") have moved to dismiss the USERRA claim for lack of subject matter jurisdiction under Article III and the Eleventh Amendment of the United States Constitution. Defendants' motion to dismiss challenges the constitutionality of 38 U.S.C. § 4323(b), which specifically authorizes a private suit in federal court against a State employer for a violation of USERRA. Pursuant to 28 U.S.C. § 2403(a) and Fed.R.Civ.P. 24(c), the court notified the Attorney General of the United States so that the United States could intervene. The United States moved to intervene and filed a brief on December 17, 1997. Defendants responded on January 7, 1998. The United States' motion to intervene as a matter of right is hereby GRANTED pursuant to 28 U.S.C. § 2403(a) and Fed.R .Civ.P. 24(c).

## Discussion

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

In *Seminole Tribe* the Supreme Court explained the scope of the amendment:

Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, "we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition ... which it confirms." *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991). That presupposition, first observed over a century ago in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that " '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.' " *Id.,* at 13 (emphasis deleted), quoting The Federalist No. 81, p. 487 (C. Rossiter ed.

---

1. Counts I and III alleged discrimination based on plaintiff's national origin in violation of Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. The court granted summary judgment for the defendants on these counts on November 4, 1997. The court found no direct evidence of discrimination based on national origin and held that the undisputed facts showed that plaintiff was not meeting his employee's legitimate expectations and that the employer's proffered reason for firing him was not a pretext.

1961) (A.Hamilton). See also *Puerto Rico Aqueduct and Sewer Authority [v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993)] ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity"). For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans, supra,* at 15. 517 U.S. at 53–54, 116 S.Ct. at 1122 (footnote omitted). In *Seminole Tribe,* the Supreme Court held that Congress cannot use the powers granted by Article I of the Constitution to give an individual a right to sue an unconsenting State in federal court. 517 U.S. at 71–74, 116 S.Ct. at 1131–32. The Court recognized, however, that the Eleventh Amendment does not bar Congress from authorizing private federal lawsuits of actions against States when it legislates under its enforcement powers granted by Section 5 of the Fourteenth Amendment. 517 U.S. at 59–60, 116 S.Ct. at 1125.

The first issue this court must address is Indiana University's suggestion that the court bypass the Eleventh Amendment issue and grant summary judgment on the merits of the USERRA claim. As explained below, the court believes that in this case, the court should not bypass the Eleventh Amendment issue. To decide the Eleventh Amendment issue, the court must then determine whether Indiana University is the legal equivalent of the State of Indiana for Eleventh Amendment purposes (it is) and whether Indiana has waived its Eleventh Amendment immunity (it has not). Finally, the court must decide whether Congress lawfully abrogated the States' Eleventh Amendment immunity in passing USERRA.

## I. *Should the Court Bypass the Eleventh Amendment Issue?*

After this court invited the United States to intervene to defend the constitutionality of the provision of USERRA authorizing private actions against State employers, Indiana University suggested that the court bypass the Eleventh Amendment issue it raised. The university argues that this court's grant of summary judgment on plaintiff's claims of national origin discrimination would also support summary judgment on the merits of the USERRA claim. The university points out that the court has already found that the undisputed facts show that plaintiff was not meeting its legitimate expectations and that its proffered reasons for firing him were not pretextual. The university contends that these legal conclusions also defeat plaintiff's USERRA claim analyzed under the indirect proof method drawn from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), that is used to evaluate employment discrimination claims under Title VII. See also *Pignato v. American Trans Air, Inc.,* 14 F.3d 342, 346 (7th Cir.1994) (approving use of indirect proof method to decide pre-USERRA claim under Vietnam Era Veterans' Readjustment Assistance Act).

■ Courts ordinarily decide Eleventh Amendment issues before reaching the merits of a claim. The Seventh Circuit has held, however, that where jurisdictional issues are difficult and the merits of a case "are simple, straightforward and easily resolved," a court may decline to address the jurisdictional issue if it would make no difference in the ultimate outcome of the case. *Isby v. Bayh,* 75 F.3d 1191, 1196 (7th Cir.1996); accord, *Safeco Life Insurance Co. v. Musser,* 65 F.3d 647, 650 (7th Cir.1995); *Rekhi v. Wildwood Industries, Inc.,* 61 F.3d 1313, 1316 (7th Cir. 1995) (when jurisdictional issues are difficult and merits are easy, "it is permissible if inelegant and even 'illogical' to skip to the latter, provided there is no practical difference in the outcome"). In addition, although federal courts often speak of Eleventh Amendment immunity as a bar to "jurisdiction" (as in *Seminole Tribe* itself, 517 U.S. at 53–54, 72–74, 116 S.Ct. at 1122, 1132), its jurisdictional character has an unusually slippery nature. Federal courts constantly remind themselves and litigants that defects in subject matter jurisdiction cannot be waived and that subject matter jurisdiction cannot be conferred by consent of the parties. Neither of these propositions is (consistently) true with respect to the Eleventh Amendment. See *Idaho v. Coeur d'Alene Tribe of Idaho,* —— U.S. ——, ——, 117 S.Ct. 2028,

2033, 138 L.Ed.2d 438 (1997) (Eleventh Amendment protection can be waived because it "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the federal judiciary's subject-matter jurisdiction"); *Patsy v. Board of Regents*, 457 U.S. 496, 516 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) ("we have never held that [the Eleventh Amendment] is jurisdictional in the sense that it must be raised and decided by this Court on its own motion"); *Komyatti v. Bayh*, 96 F.3d 955, 959 n. 4 (7th Cir.1996). Indiana University asks the court to take this approach and bypass the Eleventh Amendment issue here, pointing out that this court recently took a similar approach in an age discrimination case, in which Eleventh Amendment issues were raised. See *Foster v. Ivy Tech State College*, No. EV 95–172–C H/H (S.D.Ind. Nov. 17, 1997).

■ The court concludes the better approach here is to decide the Eleventh Amendment issue. Bypassing a threshold Eleventh Amendment issue is an unusual approach limited to cases where the court is highly confident about the merits and the Eleventh Amendment question is thorny. The Eleventh Amendment is intended, after all, to provide immunity from suit as well as from judgment. In this case the defendants may well be right about the merits of plaintiff's USERRA claim, but the standard of liability under USERRA as applied to the summary judgment record here allows some room for reasonable argument, and certainly more room than was the case in *Foster*. Plaintiff Velasquez's case under USERRA is not limited to the indirect proof method endorsed in *Pignato*, 14 F.3d at 346. There is at least some direct evidence that plaintiff's supervisors at Indiana University were irritated by his military duties and their interference with his duties for the university.

In addition, accepting, as this court has found, that Indiana University had an honest and legitimate reason for firing plaintiff, there is room for a "mixed motive" problem here. The potential complications of such a problem are illustrated in the majority and dissenting opinions in *Gummo v. Village of Depew*, 75 F.3d 98 (2d Cir.1996) (applying "motivating factor" test and reversing summary judgment for employer where reasonable jury could find employee would not have been fired if he had not been military reservist). See also *Robinson v. Morris Moore Chevrolet–Buick, Inc.*, 974 F.Supp. 571, 576–78 (E.D.Tex.1997) (applying motivating factor "but-for" test under USERRA, denying summary judgment, and distinguishing Pignato in part on grounds that employer's decision to fire Robinson was based on "totality of circumstances"); *Mike v. Ron Saxon Ford, Inc.*, 960 F.Supp. 1395 (D.Minn. 1997) (applying USERRA and finding genuine issue as to whether plaintiff's military status was a motivating factor in his discharge). The point here is not to predict how this court would rule on the merits of plaintiff's USERRA claim but to show that, even if Indiana University is entitled to summary judgment, the question allows enough room for debate to persuade this court not to bypass the Eleventh Amendment issue.[2]

## II. *Indiana University's Status as a State Entity*

■ The Eleventh Amendment's implied grant of sovereign immunity protects State agents and State instrumentalities as well as the States themselves. *Regents of the University of California v. Doe*, 519 U.S. 425, ——, 117 S.Ct. 900, 903–04, 137 L.Ed.2d 55 (1997); *Thiel v. State Bar of Wisconsin*, 94 F.3d 399, 400 (7th Cir.1996). It is now set-

---

**2.** Also, in *Foster* controlling Seventh Circuit precedent held that the Age Discrimination in Employment Act was an exercise, at least in part, of Congress' powers under Section 5 of the Fourteenth Amendment, which would defeat the Eleventh Amendment defense. See *Davidson v. Bd. of Governors of State Colleges and Universities*, 920 F.2d 441, 443 (7th Cir.1990); *EEOC v. Elrod*, 674 F.2d 601, 609 (7th Cir.1982). In deciding the merits in *Foster*, therefore, this court was simply applying Seventh Circuit precedent that remained controlling, even though one Seventh Circuit panel had recently suggested that the

issue requires a fresh look in light of *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). See *Goshtasby v. Board of Trustees of University of Illinois*, 123 F.3d 427, 428 (7th Cir.1997). In this case, by contrast, although *Jennings v. Illinois Office of Education*, 589 F.2d 935, 937–38 (7th Cir.1979), supports plaintiff's position on the Eleventh Amendment issue, it is clear that *Jennings* has been effectively overruled on the Eleventh Amendment question by the Supreme Court's decision in Seminole Tribe, as discussed below.

tled law in this circuit that Indiana University is an instrumentality of the State of Indiana for purposes of the Eleventh Amendment. See *Woods v. Indiana Univ.–Purdue Univ. at Indianapolis,* 996 F.2d 880, 883 (7th Cir.1993); *Shelton v. Trustees of Indiana Univ.,* 891 F.2d 165, 166 (7th Cir.1989); *Brown v. Indiana Univ.,* No. IP 95–1051–C H/G, slip op. at 3 (S.D.Ind.1996); *Colburn v. Trustees of Indiana Univ.,* 739 F.Supp. 1268, 1280 (S.D.Ind.1990), *aff'd,* 973 F.2d 581 (7th Cir.1992); *Shannon v. Bepko,* 684 F.Supp. 1465, 1473 (S.D.Ind.1988).[3]

Plaintiff argues, however, that a reference in *Regents of the University of California v. Doe* to Justice O'Connor's dissenting opinion in *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 62, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), should prompt this court to reexamine the validity of these cases holding that Indiana University is an instrumentality of the State of Indiana. 519 U.S. at ——, 117 S.Ct. at 905. *Doe* did not call those cases into question. In *Doe* the Court mentioned the dissent in *Hess* merely in the course of explaining that it would not address one of the *Doe* respondents' arguments. That passing reference to an issue the Court did not decide did not imply in any manner that the Indiana University cases are now of doubtful validity. Indiana University is an instrumentality of the State of Indiana entitled to sovereign immunity under the Eleventh Amendment.

### III. *Waiver of Sovereign Immunity*

■ The Indiana legislature has expressly disclaimed any waiver of Eleventh Amendment immunity on the part of the State of Indiana. Ind.Code § 34–4–16.7–3.[4] The federal courts have ruled repeatedly that Indiana has not taken action that amounts to a general waiver of its sovereign immunity. See *Gorka v. Sullivan,* 82 F.3d at 774; *NBD Bank, N.A. v. Bennett,* 67 F.3d 629 (7th Cir.1995); *Meadows v. State of Indiana,* 854 F.2d 1068, 1069 (7th Cir.1988); *Ninth Ave-*

*nue Remedial Group v. Allis–Chalmers Corp.,* 962 F.Supp. 131, 135–36 (N.D.Ind. 1997). Nevertheless, plaintiff argues that Indiana waived its sovereign immunity for purposes of this cases by enacting Ind.Code § 20–12–1–8, which provides in relevant part:

(a) An employee of a state educational institution (as defined in IC 20–12–0.5–1) may report in writing the existence of:

(1) a violation of a federal law or regulation;

\*\*\*

(b) For having made a report under subsection (a), an employee may not:

(1) be dismissed from employment;

(2) have salary increases or employment related benefits withheld;

(3) be transferred or reassigned;

(4) be denied a promotion that the employee otherwise would have received; or

(5) be demoted.

At most, § 20–12–1–8 provides *State law* protection for employees of State educational institutions who report violations of federal law or regulations. There has been no allegation or evidence in this case that plaintiff reported a violation of federal law by Indiana University, much less that he was fired for making such a report. Even if he had a claim under § 20–12–1–8, the statute says nothing about the State consenting to suit in federal court.

Plaintiff argues that § 20–12–1–8 must constitute a waiver of sovereign immunity because otherwise the State would be a "lawbreaker which contradicts itself by a claim of Eleventh Amendment immunity on one hand and statutory expression on the other which offers protection from federal law violations." Pl. Mem. at 7. This argument fails for at least three reasons. First, the statute does not offer employees protection from federal violations *per se* and thus does not create any claim for relief arising under federal law. It

---

**3.** As defendants point out, plaintiff Velasquez served as counsel for the university in *Shelton, Woods,* and *Shannon.*

**4.** Ind.Code § 34–4–16.7–3 is part of a chapter in the Indiana Code dealing with federal civil rights claims against State and local employees. The section provides:

> Nothing contained in this chapter shall be construed as a waiver of the eleventh amendment to the Constitution of the United States, as consent by the state of Indiana or its employees to be sued in any federal court, or as consent to be sued in any state court beyond the boundaries of the state of Indiana.

provides State law protection from adverse employment action for public employees who *report* violations of federal law or regulations. Second, the protection offered by the statute is not inconsistent with a reservation by the State of sovereign immunity from suit in federal court. If the statute gives a whistleblower a cause of action—a question this court does not decide—he or she could assert that claim under State law in a State forum. Finally, even if the statute reflected an inconsistency in State policy, it does not even begin to approach the unmistakable clarity required to establish a waiver of sovereign immunity. See *Port Authority Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 305, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). "In order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court.*" *Thiel v. State Bar of Wisconsin*, 94 F.3d at 403, quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (emphasis in original); see also *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (waiver should be found "only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction"). Indiana has not waived its immunity from suit in federal court.[5]

### IV. *Congressional Abrogation of State Sovereign Immunity Under USERRA*

In *Seminole Tribe* the Supreme Court announced a two-part test for determining whether State sovereign immunity has been abrogated by an act of Congress. First, Congress must make clear its intent to abrogate the immunity. 517 U.S. at 55–60, 116 S.Ct. at 1123–25. Under USERRA Congress plainly intended to abrogate State immunity from suit. The statute specifically grants federal district courts jurisdiction to hear claims brought against State employers and to award back pay, liquidated damages, and injunctive relief against a State. 38 U.S.C. § 4323(b). Although a general authorization for suit in federal court is not sufficient to abrogate Eleventh Amendment immunity, the language in USERRA shows unmistakably that Congress intended to abrogate Eleventh Amendment immunity. See *Seminole Tribe*, 517 U.S. at 55–59, 116 S.Ct. at 1123–24.

The second part of the *Seminole Tribe* analysis asks whether Congress had the power to abrogate the States' immunity. The court concludes first that *Seminole Tribe* bars reliance on congressional war powers under Article I to overcome the Eleventh Amendment and second that USERRA was not an exercise of congressional power under Section 5 of the Fourteenth Amendment.

### A. *The War Powers*

■ Article I, Section 8 of the Constitution grants to Congress the power, in relevant part:

[11] To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water.

[12] To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years.

[13] To provide and maintain a Navy.

[14] To make Rules for the Government and Regulations of the land and naval Forces.

[15] To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions.

[16] To provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training of the Militia according to the discipline prescribed by Congress.

\* \* \*

[18] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the

---

**5.** A State may waive Eleventh Amendment immunity in a specific case, but the defendants have not taken any action amounting to waiver here. See *Komyatti*, 96 F.3d at 959 n. 4.

Government of the United States or in any Department or Officer thereof.

U.S. Const., Art. 1, § 8.

USERRA prohibits discrimination in employment against members of the uniformed services on the basis of the employee's membership or obligation of service. 38 U.S.C. § 4311(a). In enacting this provision of US-ERRA and its statutory precursors, and in granting jurisdiction to federal courts to hear employees' claims for relief against State employers, Congress was exercising its war powers under Article I. See *Diaz–Gandia v. Dapena–Thompson,* 90 F.3d 609, 616 (1st Cir.1996) (Veterans' Reemployment Rights Act [VRRA], a precursor to USERRA, was based on war powers); *Reopell v. Commonwealth of Massachusetts,* 936 F.2d 12, 15–16 (1st Cir.1991) (same); *Peel v. Florida Dept. of Trans.,* 600 F.2d 1070, 1080 (5th Cir.1979) (VRRA was based on war powers and not on Fourteenth Amendment); *Jennings v. Illinois Office of Education,* 589 F.2d 935, 937–38 (7th Cir.1979) (analyzing VRRA as exercise of war powers); *Witter v. Pennsylvania National Guard,* 462 F.Supp. 299, 306 (E.D.Pa.1978) (Vietnam Era Veterans Readjustment Assistance Act was an exercise of war powers); *Camacho v. Public Serv. Comm'n of the Commonwealth of Puerto Rico,* 450 F.Supp. 231, 233 (D.P.R.1978) (VRRA was an exercise of war powers); *Schaller v. Board of Education,* 449 F.Supp. 30, 32–33 (N.D.Ohio 1978) (same). In essence, USERRA and its precursors help protect federal military interests by prohibiting employers from taking adverse action against employees who serve in the armed forces of the United States.

The Supreme Court in *Seminole Tribe* specifically held that Congress, when exercising its Article I power to regulate Indian commerce, could not abrogate States' Eleventh Amendment immunity. It stated its reasoning and conclusions, however, in broader terms:

> [W]e reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government. Even when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

517 U.S. at 71–74, 116 S.Ct. at 1131–32 (footnote omitted). In light of this passage, defendants' argument here is a simple syllogism. Major premise: When exercising its Article I powers, Congress may not abrogate States' Eleventh Amendment immunity. Minor premise; USERRA is an exercise of congressional war powers under Article I. Conclusion: In enacting USERRA. Congress could not constitutionally abrogate States' Eleventh Amendment immunity.

Supporting a contrary position are the opinions of the Courts of Appeals in *Diaz–Gandia, Reopell, Peel,* and *Jennings.* In *Jennings,* the Seventh Circuit held that Congress could abrogate Eleventh Amendment immunity under a precursor to the antidiscrimination prohibition of USERRA. 589 F.2d at 937 (applying the VRRA). The court relied primarily on the crystal-clear intent of Congress to abrogate the immunity and on the absence of any "undue burden" on the State treasury. *Id.* at 938. The court also relied on the critical role of the war powers in the Union:

> If the defendant's claim of sovereign immunity were to be honored as to this statute, a State would be impairing part of "the mechanism for manning the Armed Forces of the United States." *Alabama Power Co. v. Davis,* 431 U.S. 581, 583 [97 S.Ct. 2002, 52 L.Ed.2d 595 (1977)]. To accept defendant's position would render the Constitution self-destructive. Yet, as stated in *Lichter v. United States,* 334 U.S. 742, 781 [68 S.Ct. 1294, 92 L.Ed. 16 (1948)], involving the war contracts Renegotiation Act, the power given to Congress to prosecute war "is not destroyed or impaired by any provision of the Constitution or by any one of the amendments" (quoting with approval from an address by Chief Justice Hughes).

589 F.2d at 938. The Fifth Circuit's decision in *Peel* and the First Circuit's in *Reopell* are to the same effect. See 600 F.2d at 1080–81, 936 F.2d at 15–16.

The analysis in *Jennings, Peel,* and *Reopell* is not consistent with the Supreme Court's later decision in *Seminole Tribe*. The Court's opinion in *Seminole Tribe* makes clear that Congress, when exercising its Article I powers, does not have the power to remove the States' Eleventh Amendment immunity by merely stating clearly and forcefully its desire to do so. See 517 U.S. at 71–74, 116 S.Ct. at 1131–32. In addition, the focus in *Jennings* and *Peel* on the truly vital role of congressional war powers to justify abrogation of Eleventh Amendment immunity does not support a limitation on *Seminole Tribe*. In *Seminole Tribe*, the Court deliberately stated its conclusions broadly, in terms of all of Article I. 517 U.S. at 71–74, 116 S.Ct. at 1131–32.

In an effort to rebut the defendants' argument based on *Seminole Tribe*, plaintiff Velasquez and intervenor the United States make essentially three related arguments. First, they point out that the Supreme Court did not explicitly address war powers in deciding *Seminole Tribe*. That much is beyond dispute, but there is also no doubt that the Court stated its conclusions clearly and forcefully in terms of all of Article I. In light of that clarity, a district court would need a powerful reason to conclude that the Supreme Court did not intend for its reasoning to extend so far.[6]

In the second argument, plaintiff and the United States try to provide that powerful reason. They argue that the reasoning of *Seminole Tribe* should not extend to war powers because of the unique role those powers play in preserving the nation. The United States supports its position by noting the courts' traditional deference to congressional action in military and foreign affairs. See, *e.g., Loving v. United States,* 517 U.S. 748, 766–67, 116 S.Ct. 1737, 1748, 135 L.Ed.2d 36 (1996) (in exercise of war powers, Congress could delegate to President authority to define aggravating factors permitting court-martial to impose death penalty on member of armed forces); *Rostker v. Goldberg,* 453 U.S. 57, 64–65, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (statute requiring draft registration by men but not women did not violate equal protection component in Fifth Amendment due process clause). In *Rostker* the Supreme Court recognized that "judicial deference ... is at its apogee when the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." 453 U.S. at 70. The congressional judgment in exercising its war powers is due great deference, but deference does not mean abdication. See *id.* at 67. "In peace or in war, it is essential that the Constitution be scrupulously obeyed, and particularly that the respective branches of

---

6. In *Diaz–Gandia* the First Circuit decided to read *Seminole Tribe* narrowly. The case was argued before but decided after *Seminole Tribe* was issued. The First Circuit followed its decision in *Reopell* and held that the Eleventh Amendment did not apply to a claim under the precursor to USERRA. *Reopell* had relied on *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), the decision that *Seminole Tribe* overruled. See 936 F.2d at 15–16. In *Diaz–Gandia* the First Circuit dealt with *Seminole Tribe* in a footnote:

> The recent decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), which overrules *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), and holds that Congress lacks the power to abrogate the Eleventh Amendment under the Commerce Clause, does not control the War Powers analysis. See *CEH, Inc. v. F/V Seafarer,* 70 F.3d 694, 702 (1st Cir.1995) ("[W]e are hesitant to

ascribe to the Court a holding that goes well beyond any issue discussed there.").

90 F.3d at 616 n. 9. This court respectfully disagrees with the First Circuit's narrow reading of *Seminole Tribe* because the Supreme Court chose to frame its conclusion so broadly. Accord, *Palmatier v. Michigan Dept. of State Police,* 981 F.Supp. 529, 531–32 (W.D.Mich.1997) (doubting validity of *Diaz–Gandia* and dismissing plaintiff's USERRA claim for lack of jurisdiction under the Eleventh Amendment); see also *Close v. State of New York,* 125 F.3d 31, 38 (2d Cir.1997) (*Seminole Tribe* applies to all Article I powers, including interstate commerce power). But see *In re Sacred Heart Hosp. of Norristown,* 133 F.3d 237, 245 (3rd Cir.1998) (Roth, J., concurring) (concurring in judgment holding that bankruptcy legislation cannot abrogate Eleventh Amendment immunity, but agreeing with First Circuit's statement in *Diaz–Gandia* that Supreme Court's holding in *Seminole Tribe* "was not so broad as to strike down all sources of abrogation power in Article I.").

the Government keep within the powers assigned to each by the Constitution." *Lichter v. United States,* 334 U.S. 742, 779, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948).

The argument setting aside war powers as unique has some superficial appeal, but it is not persuasive in light of the minimal restrictions that the Eleventh Amendment actually imposes upon the federal government. Applying the Eleventh Amendment to attempts by Congress to exercise its war powers does not threaten the Union, nor does it undermine the supremacy of federal power over the States' powers. The Eleventh Amendment prohibits federal courts from exercising jurisdiction over claims by citizens against the States. It does not prevent Congress from authorizing litigation by the federal government itself to require States to conform to federal law. In fact, USERRA already authorizes the Attorney General to bring suit on behalf of an aggrieved employee, see 28 U.S.C. § 4323(a)(1). Because the Eleventh Amendment does not bar actions by the United States, *see West Virginia v. United States,* 479 U.S. 305, 311, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), there is no apparent reason why Congress could not provide for additional enforcement of USERRA by authorizing the Attorney General to sue State employers in federal court in the name of the United States. Such suits would not be barred by the Eleventh Amendment. Nor does the Eleventh Amendment relieve State courts of their obligations to hear actions arising under federal law and to apply and enforce federal law. *Seminole Tribe* also does not remove the ability of an aggrieved employee to bring suit for prospective equitable relief against a State official under the principles of *Ex parte Young,* 209

U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). See *Seminole Tribe,* 517 U.S. at 71–75 nn. 14, 16, 17, 116 S.Ct. at 1131–33 nn. 14, 16, 17.[7]

Issues concerning the war powers seem to invite arguments with an apocalyptic flavor.[8] Nevertheless, if one considers the limited practical effect of the Eleventh Amendment, and if one acknowledges the other judicial and extra-judicial avenues available for implementing federal policy, then it is clear that applying the Court's holding in *Seminole Tribe* to the war powers does not render the Constitution self-destructive. It is difficult to see how the survival of the Union could depend on the ability of a private party to bring a lawsuit in federal court when Congress has chosen *not* to empower the federal government to bring its own lawsuit to resolve the dispute. Prohibiting private USERRA lawsuits against State employers in federal court does not imperil the Union.[9]

Third, the United States points out that the States themselves never exercised war powers and never ceded those powers to the federal government. See *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 316, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (powers of external sovereignty, including war powers, "passed from the Crown not to the colonies severally but to the colonies in their collective and corporate capacity as the United States of America," so federal war powers did not depend upon affirmative grant of power by States); *Penhallow v. Doane's Administrator,* 3 U.S. (3 Dallas) 54, 80, 1 L.Ed. 507 (1795) (Paterson, J.) (during War of Independence, war powers were vested in Continental Congress, not in several States). The United States argues that this aspect of the war powers makes them unique among congressional powers and should serve to elevate the war powers above the

---

7. Plaintiff Velasquez has dropped his claims for equitable relief in this action. It is also worth noting that the Article I powers over interstate and Indian commerce—the focus of *Seminole Tribe*—have also long been considered fundamental and essential to the federal Union. In applying the Eleventh Amendment to legislation exercising the commerce power, the Supreme Court was not impressed by the idea that its holding would undermine federal supremacy, and the Court noted these same "other methods of ensuring the States' compliance with federal law." 517 U.S. at 71 n. 14, 116 S.Ct. at 1131 n. 14.

8. See, *e.g., Peel v. Florida Dept. of Transportation,* 600 F.2d at 1081 ("To hold that the eleventh amendment bars Peel's claim in this case would be to remove the states from the reach of any legitimate exercise of one of the central powers given by the states to the federal government.").

9. The United States also has not identified other federal statutes that rely upon private lawsuits as an essential mechanism to implement the federal war powers.

prohibitions of the Eleventh Amendment. The United States asserts, without specific citation, that the Supreme Court in *Seminole Tribe* "explained that in ceding *certain sovereign powers* to the federal government, the states did not empower Congress to exercise *those powers* to permit suits in federal courts by private persons." United States Br. at 6 (emphasis added). In other words, the United States urges this court to find an implicit limitation in *Seminole Tribe* —that the scope of the States' sovereign immunity from private lawsuits recognized by the Eleventh Amendment and in *Seminole Tribe* extends only to those powers in Article I that the States possessed before ratification of the Constitution and which the States then ceded to the national government in forming the Union. Under this theory, the sovereign immunity embodied in the Eleventh Amendment represents a condition attached to the grant of enumerated powers that the States gave to the federal government. Because the States never had war powers, the United States argues, the war powers must therefore fall outside of that condition.

The court assumes for purposes of argument that the United States is correct as a matter of fact about the States never having had war powers to cede to the Union in the first place.[10] But the United States has not supported the next step of the argument—the assertion that the States' Eleventh Amendment immunity is limited to lawsuits concerning powers the States ceded to the new federal government in the Constitution. That limitation on the States' immunity is not evident to this court in reading *Seminole Tribe* or other Eleventh Amendment opinions. The focus of the Eleventh Amendment is the exercise of the judicial power of the United States under Article III, not the subject matter of the lawsuit. There simply is no apparent logical or historical connection between the war powers and limitations on private lawsuits against States. Implicit in the United States' argument on this point seems to be the assertion that authorizing private lawsuits in federal courts against the States is somehow a necessary or inherent element of the war powers. One may easily

concede—any responsible person must concede—the vital and unique role of the war powers in preserving the Union. But if judicial enforcement of federal legislation against a State is vital to the Union, Congress can easily authorize the United States to bring its own lawsuits rather than relying on private lawsuits to protect the federal interest.

The primary obstacle to the United States' historical and theoretical arguments is the language and reasoning of *Seminole Tribe* itself. Although the Supreme Court did not address the war powers specifically, it is readily apparent that the Court knew what it was doing and meant what it said when it applied the Eleventh Amendment to an Article I power given exclusively to the federal government. The Court clearly held: "The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." 517 U.S. at 71–74, 116 S.Ct. at 1131–32, 134 L.Ed.2d 252. Justice Stevens' dissent called attention to the potential sweep of the majority's language, and the majority adhered to its use of the general reference to Article I rather than narrowing its holding to specific enumerated powers. 517 U.S at 72–73 n. 16, 116 S.Ct. at 1131–32 n. 16 (majority opinion); *id.* at 77 n. 1, 116 S.Ct. at 1134 n. 1 (Stevens, J., dissenting). The majority also emphasized the unique status of congressional power under the Fourteenth Amendment as the only power the Court had recognized as sufficient to authorize abrogation of the Eleventh Amendment. See 517 U.S. at 58–59, 63–66, 116 S.Ct. at 1125, 1128 (explaining that Fourteenth Amendment fundamentally altered balance of federal and State powers), citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). At bottom, the United States' arguments essentially ask this court to treat the *Seminole Tribe* majority's description of its reasoning in terms of "Article I" as an oversight or exaggeration. In light of the gravity of the issue then before the Court and the Court's reasoning and language (not to mention the place of district courts in the federal judicial hierarchy), this

10. The assertion that the States never exercised war powers individually is of course a simplified legal summary of a much more complex historical reality as the several colonies struggled to establish and maintain a united effort to win independence from Great Britain.

court will not impute such an exaggeration to the Supreme Court.

B. *Section 5 of the Fourteenth Amendment*

■ The Eleventh Amendment does not restrict the power of Congress to authorize private lawsuits against States when it exercises its enforcement powers under Section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Plaintiff Velasquez (but not the United States) contends that when Congress enacted USERRA, it was also exercising its enforcement powers under Section 5. There is no evidence in the statute itself or the legislative history that Congress intended to exercise its Fourteenth Amendment power by enacting USERRA.

It is not clear from *Seminole Tribe* whether the courts should ask which constitutional powers Congress actually intended to use or whether courts should instead ask whether Congress "could have" exercised any constitutional power to adopt the challenged legislation.[11] If the "actually exercised" test is the correct analysis, USERRA cannot be upheld as an exercise of power under Section 5 of the Fourteenth Amendment. The court's research has revealed no cases finding that USERRA or any of its precursors were enacted pursuant to the Fourteenth Amendment, nor have the parties identified any. This is not surprising. Courts "should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment...." *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 16, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). See also *Port Authority Trans–Hudson Corp. v. Feeney*, 495 U.S. at 305 (noting that, because abrogation of sovereign immunity upsets the "fundamental constitutional balance between the Federal Government and the States," the Court has adopted a "particularly strict standard" for finding abrogation). The fact that USERRA prohibits "discrimination" generally is not enough to establish that Congress has exercised its Fourteenth Amendment powers. See *Wilson–Jones v. Caviness*, 99 F.3d 203, 210 (6th

Cir.1996) (Fair Labor Standards Act held not an exercise of Fourteenth Amendment power, despite references to "discrimination" in legislative history), *mod. on other grounds*, 107 F.3d 358 (6th Cir.1997).

■ If courts should uphold legislation if it "could have" been enacted under the Fourteenth Amendment, the parties agree that *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), states the controlling test for determining whether Congress could have enacted USERRA under Section 5 of the Fourteenth Amendment to enforce the Equal Protection Clause. To be a valid exercise of Section 5 power to enforce the Equal Protection Clause, a statute: (1) must be regarded as an enactment to enforce the Equal Protection Clause; (2) must be "plainly adapted to that end"; and (3) must not be prohibited by, but instead must be consistent with the "letter and spirit of the constitution." *Katzenbach*, 384 U.S. at 651. "[T]he constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948); see also *EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (Congress need not expressly invoke Section 5 or the Fourteenth Amendment). Nevertheless, the simplest way to determine whether the first requirement is met is to look to any express declaration made by Congress regarding its source of power in enacting a statute. *Wilson–Jones*, 99 F.3d at 210. Congress made no such explicit declaration in the text of USERRA, unlike the legislation at issue in *Katzenbach*, where Congress stated that it was acting "to secure the rights under the fourteenth amendment." *Katzenbach*, 384 U.S. at 652.

In the absence of any express congressional finding that a particular group needs protection from invidious discrimination, at least one circuit considers it "best to 'regard as an enactment to enforce'" the Equal Protection Clause ... only efforts to remedy discrimination against a class of persons that Equal

11. In *Gehrt v. University of Illinois at Urbana–Champaign Cooperative Extension Serv.*, 974 F.Supp. 1178 (C.D.Ill.1997), one district court in this circuit suggested that the appropriate test is whether a statute could have been enacted pursuant to Section 5. *Id.* at 1181.

Protection Clause ... only efforts to remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection." *Wilson–Jones,* 99 F.3d at 210. This court agrees. The court is aware of no cases finding members of the uniformed services to be in need of special protection from invidious discrimination. The court also sees no "sufficiently strong logical connection" between the concerns reflected in the Fourteenth Amendment and the aims of USER-RA. *Id.*[12]

■ The Supreme Court's recent decision in *City of Boerne v. Flores* shows that even when Congress explicitly relies on Section 5, the federal courts should scrutinize the legislation carefully to determine whether Congress has exceeded its Section 5 powers. —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In striking down the Religious Freedom Restoration Act of 1993 (RFRA), the Court reasoned in *City of Boerne* that Congress had gone beyond merely enforcing the substantive rights guaranteed to individuals by the Fourteenth Amendment and had created new substantive rights. The Court wrote:

> As enacted, the Fourteenth Amendment confers substantive rights against the States which, like the provisions of the Bill of Rights, are self-executing. The power to interpret the Constitution in a case or controversy remains in the Judiciary.

—— U.S. at ——, 117 S.Ct. at 2166 (citation omitted). Consistent with the Sixth Circuit's language in *Wilson–Jones,* the Court went on to state: "Remedial legislation under § 5 should be adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against." —— U.S. at ——, 117 S.Ct. at 2170, citing *Civil Rights Cases,* 109 U.S. 3, 13, 3 S.Ct. 18, 27 L.Ed. 835

(1883). Cf. *Crawford v. Indiana Dept. of Corrections,* 115 F.3d 481, 487 (7th Cir.1997) (citing Age Discrimination in Employment Act as example of a statute validly prohibiting discrimination in form "remote from the contemplation of the framers of the Fourteenth Amendment" in holding that Americans with Disabilities Act is "well within" Congress' Section 5 powers even though racial discrimination was the original focus of the Fourteenth Amendment).[13] In light of the Supreme Court's strong language in *City of Boerne* and the Sixth Circuit's decision in *Wilson–Jones,* the court concludes that Congress could not have enacted USERRA under its Fourteenth Amendment enforcement powers even if it intended to do so. The authorization in USERRA for private lawsuits in federal court against State employers cannot be sustained as an exercise of congressional power under the Fourteenth Amendment.

### Conclusion

Congress clearly intended to abrogate the States' sovereign immunity from suits brought by individuals in federal court in enacting USERRA. In doing so, however, Congress did not act pursuant to its enforcement powers under Section 5 of the Fourteenth Amendment, nor could it have done so. Because the State of Indiana has not waived its sovereign immunity and because Indiana University is an instrumentality of the State, plaintiff's claim alleged in Count II of his First Amended Complaint is barred under the Eleventh Amendment as interpreted by the Supreme Court in *Seminole Tribe of Florida v. Florida.* Notwithstanding 38 U.S.C. § 4323, this court therefore lacks subject matter jurisdiction over Count II. Accordingly, defendant's motion is hereby GRANTED and Count II of plaintiff's First

---

**12.** Congress described the purposes of USERRA as encouraging non-career service in the uniformed services, minimizing disruption to the lives of service members as well as their employers, and prohibiting discrimination against members of the uniformed services. See 38 U.S.C. § 4301(a). As discussed above, a general desire to combat "discrimination" is not sufficient to establish that Section 5 has been invoked properly unless the discrimination is based on race or some other basis cognizable under the Fourteenth Amendment.

**13.** The Seventh Circuit has read *City of Boerne* as stating that "Section 5 confers on the legislature only the power to create remedies for violations as defined by the judicial branch...." *Goshtasby v. Board of Trustees of University of Illinois,* 123 F.3d at 428. The panel therefore viewed *City of Boerne* as calling into the question the extent to which the remedial provisions of the ADEA may be applied to the states. *Id.*

Amended Complaint is DISMISSED WITH-OUT PREJUDICE.

So ordered.