Donald M. SEVERSON and Sandra Severson, Individually and as Personal Representatives of the Estate of Jay T. Severson, Deceased, Appellants–Plaintiffs,

v.

BOARD OF TRUSTEES OF PURDUE UNIVERSITY, Purdue University, John Sautter, Marvis Boscher, Chad Johnson, David G. Lewis, in their individual capacities, Purdue University Police Department, Purdue University Police Department Officer Ken Cox, Purdue University Police Department Officer Fred Davis, in their individual capacities, Office of the Sheriff, Tippecanoe County, Indiana, and Tippecanoe County Sheriff's Department Deputy Andrew Warren, in his individual capacity, Appellees–Defendants.

No. 79A05–0112–CV–559.

Court of Appeals of Indiana.

Nov. 7, 2002.

Andrew P. Wirick, Hume Smith Geddes Green & Simmons, LLP, Indianapolis, IN, Attorney for Appellants.

John M. Stuckey, Laura L. Bowker, Stuart & Branigin, LLP, Lafayette, IN, Attorneys for Appellees, Board of Trustees of Purdue University, Purdue University, John Sautter, Marvis Boscher, Chad John-

son, David G. Lewis, Purdue University Police Department, PUPD Officer Ken Cox, and PUPD Officer Fred Davis.

Douglas J. Masson, Hoffman, Luhman & Masson, P.C., Lafayette, IN, Attorneys for Appellees, Office of the Sheriff, Tippecanoe County, Indiana, and Tippecanoe County Sheriff's Deputy Andrew Warren.

## OPINION

BAKER, Judge.

A Purdue University freshman brutally murdered his resident-advisor Jay Severson after Jay had reported the freshman's cocaine possession to the police. Jay's parents sued Purdue, Purdue's Board of Trustees, four Purdue employees, and law enforcement agencies and officers who, at the time of the murder, were investigating the freshman's alleged drug dealing. The trial court granted summary judgment to all the defendants on each of the Seversons' federal and state claims. We agree that none of the defendants were liable under federal or state law for Jay's death.

### FACTS

Twenty-seven-year-old Jay Severson was a graduate student at Purdue University for the 1996 fall semester. In addition to pursuing his course work, Jay was employed by Purdue as a residential advisor for one of Purdue's residence halls. His duties included counseling student residents and, when necessary, reporting student-resident criminal violations to the Purdue University Police Department (PUPD). He reported one such violation on September 15, having observed a bag of marijuana in the room of Matthew Schulz, one of Jay's floor residents. The police arrived and took Schulz, Jay, and the marijuana to the police station, where Schulz claimed that the marijuana was not his but belonged to a friend.

Less than a month later, on October 11, Jay returned to the PUPD where he met with Officer Ken Cox. Jay told Officer Cox that he "had received third hand" information "from one of his residents about the possible use of drugs on the floor." Appellants' App. p. 251. He identified Schulz and Schulz's roommate, Jerrod Eskew, as possibly being involved with narcotics. Jay also noted that his source of information wished not to be named.

Four days after meeting with Officer Cox, Jay entered Schulz and Eskew's room to check the smoke detector. Eskew and a friend, Jamin Willoughby, were the only ones present in the room at the time. Upon entering, Jay noticed Eskew hide something under his hat. When he questioned Eskew about what was under the hat, Eskew uncovered the cocaine. According to Willoughby, Eskew threatened to kill Jay if Jay told the police about the cocaine. Although Jay's encounter with Eskew took place at 7:30 p.m., Jay waited until 8:40 p.m. to notify the PUPD. In a police report filed the same night, Jay explained the reason for the delay:

> I didn't want to mess up what the police already had going on so I B.S.ed with them and told them that I would be quiet about it. I told [PUPD Officer] Ken Cox @ 8:40 [p.m.] and he wanted to move on it right away.

Appellants' App. p. 246.

The police immediately proceeded to Schulz and Eskew's room, but Eskew had fled the room by the time they arrived. While the police were searching the room and Eskew's car, Eskew hid in Willoughby's room, which was located in the same residence hall. At around 2:00 a.m. that morning, Willoughby drove Eskew to Crawfordsville where Eskew obtained a shotgun and sawed off the barrel. The two returned to the residence hall that afternoon. Eskew walked to Jay's room

and shot Jay, killing him almost instantly. Eskew then turned the gun on himself and committed suicide.

On April 25, 2001, the Seversons, individually and as personal representatives of Jay's estate, filed their third amended complaint for damages resulting from Jay's death. The complaint named the Board of Trustees of Purdue University, Purdue University, and four Purdue employees "in their individual capacities." Appellants' App. p. 161. The four Purdue employees are as follows:

(1) John Sautter—vice president of the residence halls and Director of Residence Halls;

(2) Marvis Boscher—assistant director for residential life for Purdue;

(3) Chad Johnson—manager for the residence hall in which Jay was murdered; and

(4) David G. Lewis—assistant manager for the same.

The complaint also included the law enforcement agencies and personnel involved in investigating Eskew's possible drug dealing from the residence hall:

(1) The PUPD and PUPD Officers Ken Cox and Fred Davis in their individual capacities; and

(2) The Office of the Sheriff, Tippecanoe County, Indiana, and Tippecanoe County Sheriff's Deputy Andrew Warren, in his individual capacity.

The Seversons brought a broad assortment of federal and state claims. Under their federal § 1983 claims,[1] the Seversons contended that they were deprived of their constitutional liberty interest in maintaining a relationship with their son. Jay's estate, according to the complaint, suffered lost income for Jay's life expectancy and "hedonic damages for the non-economic value of being alive" as a result of being deprived of his constitutional rights. Appellants' App. p. 175. As for the state law claims, the Seversons asserted negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent hiring and supervision, in addition to violations of Article I, Sections 1, 12, and 21 of the Indiana Constitution. The Seversons also incorporated a claim for a declaratory judgment "that the Defendants violated the constitutional rights of the Plaintiffs." Appellants' App. p. 175.

In response, Purdue (including the Board of Trustees, the four individual employees, the PUPD, and the two PUPD officers) filed a motion for summary judgment. The Tippecanoe County Sheriff's Office and Tippecanoe County Sheriff's Deputy Andrew Warren (collectively, the Tippecanoe County defendants) filed a separate motion for summary judgment. On July 13, 2001, the Tippecanoe County defendants filed a motion to strike the entire affidavit of David L. Johnston, the Seversons' expert witness who was used to oppose the motions for summary judgment. Three days later on July 16, 2001, all the defendants joined in filing a motion to strike portions of other evidentiary materials submitted by the Seversons in their memorandum in opposition to summary judgment. In turn, the Seversons filed a motion to strike portions of the reply briefs submitted by Purdue and the Tippecanoe County defendants along with designated evidence offered in support of Purdue's reply brief.

The trial court eventually granted both motions for summary judgment against the Seversons on all their claims. However, the trial court denied all the motions to strike. The Seversons now appeal the grant of summary judgment on both mo-

---

1. 42 U.S.C. § 1983.

tions as well as the denial of their motion to strike. The Tippecanoe County defendants appeal the denial of the July 13 motion to strike, while Purdue appeals the denial of the July 16 motion to strike.

## DISCUSSION AND DECISION

### I. Standard of Review

The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Owens Corning Fiberglass Corp. v. Cobb*, 754 N.E.2d 905, 908 (Ind.2001). Summary judgment is appropriate only if the pleadings and evidence sanctioned by the trial court show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ind. Trial Rule 56(C). The review of a summary judgment motion is limited to those materials designated to the trial court. Ind. Trial Rule 56(H); *Rosi v. Bus. Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Owens Corning*, 754 N.E.2d at 909.

### II. The Seversons' § 1983 Claims

#### A. § 1983 "Person"

Before considering whether a defendant has deprived a plaintiff of a right under the color of law, it is first necessary to determine whether a particular defendant is a "person" amenable to suit under § 1983. That statute allows citizens to sue government officials for violations of federal rights:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added). The precursor to § 1983—§ 1 of the Civil Rights Act of 1871—was a congressional enactment responding " 'to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers.' " *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (quoting *Felder v. Casey*, 487 U.S. 131, 147, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)). The legislative history of the word "person" in § 1983 indicates Congress intended to subject "state officers" to suit but not "States of the Union." *Id.* at 68–69, 109 S.Ct. 2304.

A review of U.S. Supreme Court precedent reveals three basic factors that determine whether a particular entity is a "person" under § 1983. Chief among these factors is the type of governmental entity being sued, that is, whether the entity is a state, state agency (arm of the state),[2] state official, municipality, municipal official, or some other local governmental unit or political subdivision. A second factor is whether the plaintiff seeks retro-

---

**2.** The terms "state agency" and "arm of the state" are used interchangeably in federal case law.

spective (monetary) or prospective (injunctive) relief. A third factor, when dealing with a suit against a state official, is whether the plaintiff brings an "official-capacity" claim or "personal-capacity" (individual-capacity) [3] claim.

■ Both a municipality and a municipal official sued in his official capacity are "persons" amenable to suit under § 1983 for retrospective (monetary) and prospective (injunctive) relief. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that § 1983 applies to "municipalities and other local government units"); *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (holding that § 1983 applies to a municipal official sued in his official capacity). As for a state or state agency, neither may be sued as a person under § 1983, no matter what relief—retrospective or prospective—is requested. *Will*, 491 U.S. at 64, 109 S.Ct. 2304 (a state is not a § 1983 "person"); *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 365, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990) (arm of the state not a § 1983 "person"). If a plaintiff requests retrospective relief, then *a state official* sued *in his official capacity* is also *not* a "person" under § 1983. *See Will*, 491 U.S. at 71, 109 S.Ct. 2304. If, on the other hand, a plaintiff requests prospective relief, then *a state official* may be considered a "person" under § 1983. *See id.* at 71 n. 10, 109 S.Ct. 2304.

■ The inapplicability of § 1983 to particular defendants parallels Eleventh Amendment [4] protections from suit. The Eleventh Amendment bars a state from being sued in its own name regardless of whether a plaintiff seeks retrospective or prospective relief. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Though the Eleventh Amendment does not apply in state courts, *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 205, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991), the relief available in federal and state courts under § 1983 is deemed the same. *Howlett ex rel. Howlett*, 496 U.S. at 365, 110 S.Ct. 2430 ("[A] State and arms of [a] State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal court or state court."); 1B Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation: Claims and Defenses* § 8.14, at 196–97 (3d ed. 1997) ("[T]he relief available (and unavailable) against state governments and agencies in state and federal court § 1983 actions is the same. The Supreme Court's decision in *Howlett [ex rel. Howlett] v. Rose* makes clear that state law may neither expand nor contract the congressionally established contours of § 1983 and its defenses." (footnote omitted)). Hence, neither a state *nor a state agency* is a person under § 1983 even when sued for prospective relief in state court—where the Eleventh Amendment has no force.

■ A state official, on the other hand, is a "person" under § 1983 when sued in his *personal capacity* for actions taken under color of state law. *Hafer v. Melo*, 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). "[O]fficers sued in their personal capacity come to court as individuals. A government official in the role of personal-capacity defendant thus fits comfortably

---

**3.** The terms "personal capacity" and "individual capacity" are used interchangeably in federal case law.

**4.** The Eleventh Amendment provides: "The Judicial Power of the United States shall not

be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

within the statutory term 'person.'" *Id.* Under the law of the Seventh Circuit, when a "complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint." *Hill v. Shelander,* 924 F.2d 1370, 1374 (7th Cir.1991). To determine whether a plaintiff brings an official-capacity suit, personal-capacity suit, or both, a court should look to the relief requested and the nature of the defendant's conduct alleged. *Id.*

In sum, five general rules resolve whether an entity is a "person" amenable to suit under § 1983:

(1) A municipality, municipal official, or other local governmental unit or political subdivision may be sued for retrospective or prospective relief.

(2) A state or state agency (arm of the state) may not be sued as a "person" under § 1983, no matter what relief is requested.

(3) A state official sued in his official capacity is not a "person" under § 1983 when sued for retrospective relief. But a state official sued in his official capacity is a "person" under § 1983 when sued for prospective relief.

(4) A state official sued in his personal (individual) capacity for retrospective relief is a "person" amenable to suit under § 1983.

(5) If an entity would enjoy Eleventh Amendment immunity in federal court, it will not be considered a § 1983 "person" in state court, even though the Eleventh Amendment has no force in state court.

Though the briefs on appeal tend to lump the defendants into two groups—(1) the Purdue defendants and (2) the Tippecanoe County defendants—the defendants here actually fall into seven different groups for purposes of determining whether they are § 1983 "persons." In accord with the principles set out above, each of the seven groups will be examined for amenability to suit under § 1983, beginning with the institution Purdue University.

#### 1. Purdue University

■ The Seversons level two main arguments in favor of regarding Purdue as a "person" under § 1983. First, relying on *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), they maintain that an examination of the factual record is warranted to determine whether Purdue is a state agency, notwithstanding several federal court of appeals decisions (including the Seventh Circuit) concluding state universities are arms of a state. Second, according to the Seversons, " '[t]o the extent Plaintiffs' Third Amended Complaint seeks declaratory relief, the issue of 'personhood' does not bar such relief, as 'official capacity actions for prospective relief are not treated as actions against the state.'" Appellants' Br. p. 20 (alteration added) (quoting *Will,* 491 U.S. at 71 n. 10, 109 S.Ct. 2304).

The bulk of the Seversons' argument in favor of considering Purdue a "person" under § 1983 rests on their interpretation of *Hess v. Port Authority Trans–Hudson Corp.* In *Hess,* the U.S. Supreme Court concluded that the Port Authority Trans–Hudson Corporation (Port Authority) was not a state agency entitled to Eleventh Amendment protection from suit. 513 U.S. at 33, 115 S.Ct. 394. New Jersey and New York created the Port Authority in 1921 when Congress consented to the compact between the two states in exercise of its authority under the Interstate Compact

Clause.[5] *Id.* at 35, 115 S.Ct. 394. The Supreme Court relied on a presumption that a "Compact Clause agency does not qualify for Eleventh Amendment immunity '[u]nless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States themselves, and that Congress concurred in that purpose.'" *Id.* at 43–44, 115 S.Ct. 394 (alteration in original) (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979)).

The *Hess* Court believed that protecting state treasuries from federal-court judgments was one of two main reasons behind ratification of the Eleventh Amendment. *Id.* at 48, 115 S.Ct. 394. The other was protecting the dignity of the sovereign state from federal-court judgments. *Id.* at 47, 115 S.Ct. 394. To the Court's thinking, the Port Authority was structured to be financially self-sustaining and that its resulting fiscal independence protected the treasuries of its parent states from liability. *Id.* at 50, 115 S.Ct. 394. The Port Authority's ability to pay judgments without resort to its parent state treasuries did not implicate the fiscal basis for the Eleventh Amendment's adoption. *Id.* Nor did bringing into federal court a bi-state entity created by two sovereign states and the Congress impinge on the dignity of either parent state. *Id.* at 47, 115 S.Ct. 394. Requiring the Port Authority, therefore, to answer in federal court for damages suffered by injured railroad workers (under the Federal Employers' Liability Act) did not "touch the concerns—the States' solvency and dignity—that underpin the Eleventh Amendment." *Id.* at 52, 115 S.Ct. 394.

Based on *Hess*, the Seversons contend that an examination of the "factual record" is now required to assess Purdue's status as a § 1983 "person." Appellants' Br. p. 20. The "prevailing factor," according to the Seversons, in an assessment of any entity's "person" status is the extent to which the state "bears legal responsibility for the debts of the entity." Appellants' Br. p. 21. The Seversons assert, "Indiana will never have to write out a check for any judgment paid in this case." Appellants' Br. p. 22. Then, the Seversons launch into a litany of unsupported statements about Purdue's fiscal make-up:

(1) "Purdue derives a significant source of income from private not-for-profit foundations."

(2) "The foundations receive gifts from private individuals as well as profits from real estate holdings."

(3) "Tuition fees are paid by private individuals."

(4) "None of this income comes from State offices."

(5) "The Attorney General has never entered an Appearance on behalf of Purdue."

Appellants' Br. p. 22. These unsupported statements are capped with the conclusion: "All of these indicia of non-state involvement provide ample reasons why summary judgment should have been denied." Appellants' Br. p. 22.

In addressing the Seversons' contention, we first note that a number of pre-*Hess* decisions handed down by the Seventh Circuit and Indiana federal district courts held that public universities are arms of the state and, therefore, are not "persons" under § 1983. *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir.1987); *Colburn v. Trustees of Ind. Univ.*, 739 F.Supp.

**5.** U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the consent of Congress, ... enter into any Agreement or Compact with another State....").

1268, 1280 (S.D.Ind.1990), *aff'd*, 973 F.2d 581 (7th Cir.1992); *Wellman v. Trustees of Purdue Univ.*, 581 F.Supp. 1228, 1230–31 (N.D.Ind.1984) (holding that Purdue and its Board of Trustees are instrumentalities of the state and, therefore, entitled to Eleventh Amendment immunity). The Seventh Circuit observed in *Kashani* that every circuit court of appeals to decide the issue held in favor of Eleventh Amendment immunity for state universities. 813 F.2d at 845 (citing the decisions of the First, Sixth, Ninth, and Tenth Circuits).

If *Hess* did call into question the continuing validity of these holdings, the Supreme Court put any alleged doubts to rest in *Regents of the University of California v. Doe*, 519 U.S. 425, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). *Regents*, decided three years after *Hess*, held that an indemnity agreement between the federal government and the University of California did not divest the university of its Eleventh Amendment immunity from suit. *Id.* at 426, 117 S.Ct. 900. In distinguishing *Hess*, the Court noted that *Hess* involved a "bistate entity" and that " 'both legally and practically' neither of the relevant States would have been obligated to pay a judgment obtained against the bistate entity." *Id.* at 430, 117 S.Ct. 900 (quoting *Hess*, 513 U.S. at 51–52, 115 S.Ct. 394). The Court reasoned that an entity's potential legal liability—not its ability to require a third party to reimburse it—is relevant to the inquiry into whether a particular entity is an arm of the state. The *Regents* Court further explained:

> Ultimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore "one of the United States" within the meaning of the Eleventh Amendment, *is a question of federal law. But that federal question can be answered only after considering the pro-*

> *visions of state law that define the agency's character.*

*Id.* at 430 n. 5, 117 S.Ct. 900 (emphasis added).

A number of Indiana statutes—by creating Purdue itself, establishing its powers, and funding its mission—"define" Purdue's character as "an arm of the State." *See, e.g.*, Ind.Code §§ 20–12–35–1 to –3 (establishing Purdue as a state-created land grant college in the 1800s); Ind.Code § 20–12–37–2 (granting the Governor of Indiana authority to appoint ten of Purdue's thirteen trustees); Ind.Code §§ 20–12–1–1, –2 (recognizing that appropriations from the General Assembly support Purdue and establishing the powers of Purdue trustees); Ind.Code §§ 4–12–1–2(d), –7 (requiring Purdue to submit annual financial statements on expenditures and a statement of necessary expenditures for the prospective budget period).

■ Moreover, as the *Regents* Court made clear, determining whether an entity is an arm of the state is a question of federal law. In 2000, the Seventh Circuit decided that very federal question in favor of a public university seeking status as an arm of the state. The court in *Power v. Summers* held that Vincennes University was an arm of the state. 226 F.3d 815, 818 (7th Cir.2000). This conclusion was based on: (1) the university's creation by Indiana statute, (2) the fact that two-thirds of Vincennes University's budget comes from the state, and (3) nine of the fourteen trustees are appointed by the governor. *Id.* The *Power* court, furthermore, cited pre-*Hess* precedent, which established that other Indiana state universities are arms of the state for purposes of the Eleventh Amendment. *Id.* (citing *Kashani*, 813 F.2d at 845, and *Shelton v. Trustees of Ind. Univ.*, 891 F.2d 165, 166 (7th Cir.1989)).

In light of (1) the holding in *Regents*, (2) an examination of relevant Indiana statutes, and (3) *Power's* holding and reaffirmation of pre-*Hess* precedent, Purdue is properly classified an arm of the state for purpose of § 1983 claims. As an arm of the state, Purdue is not a § 1983 "person" amenable to § 1983 claims.

■■■ Given that Purdue is not subject to suit under § 1983, the next question to be addressed is the proper disposition of § 1983 claims against Purdue. Was the appropriate disposition grant of summary judgment or should it have been dismissal of the § 1983 claims against Purdue itself? The answer depends on whether a court has subject matter jurisdiction over a § 1983 claim asserted against a *non*-§ 1983 "person." The Seventh Circuit, in *Kashani*, affirmed the dismissal of § 1983 claims against Purdue for lack of subject matter jurisdiction. 813 F.2d at 844, 848. Subsequently, in *Power*, the Seventh Circuit noted that the proper disposition of § 1983 claims against a state is dismissal because a state is not "person" under § 1983. 226 F.3d at 818 (citing *Vt. Agency of Natural Res. v. U.S.*, 529 U.S. 765, 770, 788, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (holding that dismissal of claim against state agency was appropriate because it was not a "person" amenable to suit under the federal False Claims Act for purposes of *qui tam* liability)).

■■■ In the instant case, challenging Purdue's status as a § 1983 "person" was "an attack on the court's subject-matter jurisdiction" over the § 1983 claim against Purdue. *See Stewart v. Kingsley Terrace Church of Christ, Inc.*, 767 N.E.2d 542, 544 (Ind.Ct.App.2002). An attack on a court's subject matter jurisdiction cannot form the basis of a motion for summary judgment. *Perry v. Stitzer Buick, GMC, Inc.*, 637 N.E.2d 1282, 1286 (Ind.1994). "[W]hen not pled in the answer, the appropriate vehicle for such a challenge is a motion to dismiss for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1)." *Id.* When Purdue filed its motion for summary judgment, claiming it was not a § 1983 "person," the trial court should have treated it as a motion to dismiss for lack of subject matter jurisdiction. *See id.*

■■■ The lack of subject matter jurisdiction may be raised at any time, and either the trial court or the appellate court is required to consider the issue sua sponte if it is not questioned by the parties. *Town Council of New Harmony v. Parker*, 726 N.E.2d 1217, 1227 (Ind.) ("Where lack of subject matter jurisdiction in the original tribunal is apparent from the record, it is the duty of the reviewing court to raise and determine the issue sua sponte."), *amended on reh'g on other grounds by* 737 N.E.2d 719 (Ind.2000). In the instant case, neither party raised the issue of subject matter jurisdiction and the requirement of dismissal of § 1983 claims against Purdue. Abiding by our duty as a reviewing court we have raised the issue of Purdue's § 1983 status and subject matter jurisdiction sua sponte. Because Purdue is not amenable to § 1983 claims, we will treat Purdue's motion for summary judgment as a motion to dismiss § 1983 claims against it for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1). *See Stewart*, 767 N.E.2d at 545 ("[E]ven if the trial court had erred in treating this issue as a matter of summary judgment, this court would treat Kingsley Terrace's motion for summary judgment as a motion to dismiss for lack of subject matter jurisdiction under T.R. 12(B)(1)."). Accordingly, we reverse the entry of summary judgment in favor of Purdue on the Seversons' § 1983 claims and remand for dismissal of those same claims against the university.

### 2. Purdue Board of Trustees

■ The Seventh Circuit regards a board of trustees of a state university as an entity separate from the state university itself. *See Shelton,* 891 F.2d 165 (acknowledging that the Eleventh Amendment bars § 1983 claims for money damages against Indiana University trustees in their official capacities but does not bar § 1983 claims for injunctive relief against the same trustees in their official capacities); *Kashani,* 813 F.2d at 844, 848 (affirming dismissal of all § 1983 claims against Purdue University but reversing dismissal of § 1983 claims—for injunctive relief—against trustees in their official capacities). Even though the Seversons did not distinguish Purdue's Board of Trustees from the university itself for purposes of § 1983, federal case law interpreting § 1983 does so.

The Seversons sued the Board of Trustees of Purdue University as a group, rather than naming the members of the Board individually. We, therefore, will consider the § 1983 claims against the Board of Trustees as claims against the board members in their official capacities. As was made clear in *Will,* state officials acting in their official capacities are not subject to suits for retrospective relief. *Will,* 491 U.S. at 71, 109 S.Ct. 2304. They may be sued only in their official capacity for prospective relief. *See id.* at 71 n. 10, 109 S.Ct. 2304 (noting that a § 1983 claim for injunctive relief against a state official in his official capacity is permitted under § 1983). In their third amended complaint, the Seversons requested "a declaratory judgment from this Court that the Defendants violated the constitutional rights of the Plaintiffs." Appellants' App. p. 175. We will treat their § 1983 claim for declaratory relief as a claim for prospective relief against the members of the Board of Trustees in their official capacities. In

sum, for purposes of § 1983 claims of prospective relief against them in their official capacities, the members of the Board of Trustees are § 1983 "persons."

### 3. Purdue Employees: Sautter, Boscher, Johnson, and Lewis

■ The Seversons sued Sautter, Boscher, Johnson, and Lewis in their individual capacities, assuming that the four men were state officials. Appellants' App. p. 161. In addition, the complaint asserted that the four men through their "actions and official policies and customs" created a dangerous situation by requiring residential advisors to investigate and confront suspected drug offenders. Appellants' App. p. 172–73. Having lumped all the Purdue employees into one category, Purdue did not address the propriety of personal-capacity claims brought against state officials under § 1983. As noted above, a state official may be sued in his official capacity for prospective—not retrospective—relief. A state official sued in his personal capacity, on the other hand, is a "person" under § 1983 even when money damages are requested. *Hafer,* 502 U.S. at 27, 112 S.Ct. 358 ("[O]fficers sued in their personal capacity come to court as individuals. A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term 'person.'"). "[When a] complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint." *Hill,* 924 F.2d at 1374. Sautter, Boscher, Johnson, and Lewis are § 1983 "persons" for retrospective and prospective relief for actions taken in their individual capacities.

### 4. Purdue University Police Department

■ No party cited any authority addressing whether police departments, uni-

versity or otherwise, are "persons" amenable to suit under § 1983. Nor did any party distinguish the PUPD from Purdue University itself in their respective analyses of § 1983 "person" status. At oral argument, the Seversons conceded that the PUPD was part of Purdue. According to a treatise focusing solely on § 1983 litigation, "Numerous lower court decisions hold that municipal departments, commissions and associations, such as police, sheriff, and corrections departments, are not suable under § 1983." 1B Schwartz & Kirklin, *supra*, § 5.2, at 486 (citing seventeen lower federal court decisions holding that police and corrections departments are not § 1983 "persons"). It appears, then, that if the PUPD is considered part of Purdue, it is entitled to the same immunity as the university. Moreover, even if the PUPD is considered a separate entity from Purdue University, numerous lower federal courts have held that police departments are not "persons" under § 1983. *See id.* Either way, the PUPD is not a § 1983 "person." Accordingly, we reverse the summary judgment granted in favor of the PUPD on the Seversons' § 1983 claims and remand for dismissal of those same claims against the PUPD.

### 5. Purdue University Police Department Officers Cox and Davis

While a police department may not be a "person" under § 1983, a law enforcement officer may be considered a § 1983 "person" as long as the officer acted under color of state law in depriving a person of his rights under the U.S. Constitution or federal statute. *See West v. Atkins*, 487 U.S. 42, 50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ("[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). Again, no party discussed the applicability of § 1983 "person" status to PUPD Officers Cox and Davis apart from Purdue itself. For the same reasons Purdue employees Sautter, Boscher, Johnson, and Lewis are § 1983 "persons," PUPD Officers Cox and Davis are § 1983 "persons." *See supra* Part II.A.3.

### 6. Office of the Sheriff, Tippecanoe County, Indiana

The Seversons concede in their Appellants' brief, "The Tippecanoe County Defendants are correct that the Office of the Sheriff of Tippecanoe County, Indiana should not be held liable under 42 U.S.C. § 983[sic]. The only claims Plaintiffs are prosecuting against the Office of the Sheriff of Tippecanoe County, Indiana are under state common and Constitutional law." Appellants' Br. p. 37. Because of their concession and the absence of any argument in their brief about the § 1983 "person" status of the Office of the Sheriff, we decline to address the issue. We will note, however, that the Seventh Circuit has regarded the Office of the Sheriff as a § 1983 "person" when the sheriff "performs duties as the principal executive officer or chief law enforcement officer of the county." *Scott v. O'Grady*, 975 F.2d 366, 371 (7th Cir.1992). A sheriff may, however, act as an arm of the state depending on the duties being performed. *See id.*

### 7. Tippecanoe County Sheriff's Department Deputy Warren

For the same reasons Purdue employees Sautter, Boscher, Johnson, and Lewis are § 1983 "persons," Deputy Warren is a "person" under § 1983. *See supra* Part II.A.3.

### 8. Summary of § 1983 "Person" Status

In sum, Purdue University and the PUPD are not § 1983 "persons," so the

§ 1983 claims against those entities are dismissed for lack of subject matter jurisdiction. The Seversons do not challenge the summary judgment granted in favor of the Office of the Sheriff of Tippecanoe County on the § 1983 claims, though it appears the Office of the Sheriff may be a § 1983 "person" depending on the duties being performed. Therefore, we will not disturb the summary judgment entered in favor of the Office of the Sheriff of Tippecanoe County on the § 1983 claims. The only entities which remain amenable to the instant suit under § 1983 are: (1) the members of the Purdue University Board of Trustees for actions taken in their official capacities subject to prospective relief; (2) Purdue employees Sautter, Boscher, Johnson, and Lewis; (3) PUPD Officers Cox and Davis; and (4) Tippecanoe County Sheriff's Deputy Warren. We address below the Seversons' claim that these four groups of defendants deprived Jay and them of their respective constitutional rights.

*B. Substantive Due Process Deprivation*

As personal representatives, the Seversons bring § 1983 claims on behalf of Jay's estate for the alleged deprivation of his substantive due process rights. In addition, they bring § 1983 claims on their own behalf, maintaining that they were deprived of their substantive due process right to a relationship with their adult son. Their claims for personal deprivation are permitted by *Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir.1984). In *Bell,* the Seventh Circuit held that a father could recover under § 1983 for the "unlawful breach of the parent-child relationship by virtue of the child's death" when his twenty-three-year-old son suffered an alleged wrongful death. *Id.* at 1244. The Seversons have alleged a substantive due process deprivation based solely on the fact of Jay's death. It follows that if none of the defendants deprived Jay of his substantive due process rights, then the Seversons could not have been deprived of their substantive due process rights.

 There are two basic elements of a § 1983 claim. "To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) the defendant deprived the plaintiff of a right secured by the Constitution and the laws of the United States, and (2) the defendant acted under color of state law." *Reed v. City of Chicago,* 77 F.3d 1049, 1051 (7th Cir.1996). The Seversons' claim of substantive due process deprivation centers on governmental liability for the harmful act of a third party. In essence, the Seversons allege that the state officials failed in their duty to protect Jay from Eskew.

Any examination of governmental liability for failure to protect a citizen from third-party criminal attacks necessarily begins with *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the U.S. Supreme Court made plain the government's responsibility for protecting citizens from one another:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text.... *Its purpose was to protect the people from the State, not to*

*ensure that the State protected them from each other.* The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

489 U.S. at 195–96, 109 S.Ct. 998 (citations omitted) (emphasis added). The Seversons acknowledge that in general the government does not have a duty to protect citizens from one another. They contend, however, that two exceptions to the general rule apply in the instant case: (1) the "state-created danger" ("snake-pit") exception and (2) the "special relationship" exception.

*1. "State–Created Danger" / "Snake Pit"*

 The Seversons first contend that the four Purdue employees created a "snake pit" in the form of a residential advisor program because residential advisors were required to perform inherently dangerous drug-enforcement duties. According to the Seversons, these inherently dangerous duties, coupled with inadequate training and supervision, "created a reasonably foreseeable risk that a confrontation between a [residential advisor] and an advisee concerning the latter's drug use could escalate to violence and even, as in this case, death." Appellants' Br. p. 24.

The "snake-pit" moniker apparently originated from *Bowers v. DeVito*, 686 F.2d 616 (7th Cir.1982). Acknowledging that the line between state action and inaction is indistinct, the *Bowers* court wrote, "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.* at 618. In the same opinion, however, the court made clear that a government actor would generally not be held responsible for the criminal acts of third parties:

There is a constitutional right not to be murdered by a state officer, for the state violates the Fourteenth Amendment when its officer, acting under color of state law, deprives a person of life without due process of law. *But there is no constitutional right to be protected by the state against being murdered by criminals or madmen.* It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment or, we suppose, any other provision of the Constitution. The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order.

*Id.* (emphasis added). The *Bowers* court held that the government did not put the victim in the position of danger; rather, it simply failed to adequately protect her as a member of the public. *Id.*

*Bowers* is just one of a number of Seventh Circuit precedents holding that a government actor did not place a victim in a position of danger, though the actor may have failed to protect the victim. *See Stevens v. Umsted*, 131 F.3d 697, 705–06 (7th Cir.1997) (holding that superintendent's knowledge alone of sexual assaults committed against a student was insufficient to show that the superintendent placed the student in danger); *Wallace v. Adkins*, 115 F.3d 427, 430 (7th Cir.1997) (holding that prison officials had no duty to protect prison guard whom they had stationed in a prisoners' unit and had assured were taking action to prevent contact between the guard and a prisoner who had attacked him previously); *cf. Dawson v. Milwaukee Housing Auth.*, 930 F.2d 1283, 1284 (7th Cir.1991) (holding that public housing authority did not have duty to protect

victim-resident from a violent resident even when it knew the violent resident had previously threatened to harm victim-resident and had stabbed a third resident).

Even if the defendants had known of the danger posed by Jerrod Eskew, they would not be liable for Jay's death because substantive due process imposes no obligation to protect citizens from private harm even in the face of known dangers. The defendants did not force Eskew to possess drugs or compel Eskew to obtain a shotgun and saw off the barrel. The defendants did not encourage Eskew to return to the dormitory to shoot Jay. The defendants did not lock Jay and Eskew in the same room and hand Eskew a sawed-off shotgun. Evidentiary designations similar to those may have avoided summary judgment on the Seversons' "state-created danger" theory. The Seversons have alleged no such facts in their complaint or in the materials accompanying their motion in opposition to summary judgment. Accordingly, the trial court properly granted the defendants summary judgment on the Seversons' claim that the defendants deprived Jay of his substantive due process rights through a state-created danger.

### 2. "Special Relationship"

The Seversons maintain that a reasonable inference can be drawn that Jay informed Officers Cox and Davis and Deputy Warren that Jerrod had threatened to kill him and that the officers undertook to protect Jay. As a result, a special relationship then formed between the law enforcement personnel (and their employers) and Jay. Two facts, in their estimation, create the inference that Jay informed the officers of the threat: (1) Jay took the death threat seriously, and (2) Jay spent a substantial amount of time with the officers on the night of October 15. Hence, according to the Seversons, a reasonable inference can be drawn that Jay informed the officers of the death threat. Appellants' Br. p. 14. They also argue that during the same time period that the officers were searching for Jerrod, the dorm "floor was abuzz as word rapidly spread of the death threat made by J[e]rrod to Jay." Appellants' Br. p. 14. The officers, their argument runs, became aware of the conversations and learned of the threat.

When Jay expressed concern that he may not have acted diligently enough in reporting Eskew's crime, Deputy Warren reassured Severson by saying something to the effect of, "Don't worry, we'll get this all worked out," Appellants' App. p. 50, "Don't worry, we'll find him," or "It will all work out." Appellants' App. p. 133. Such was the extent of Deputy Warren's conversation with Jay. The Seversons argue that Deputy Warren, on behalf of the officers investigating Eskew's drug possession, "promised Jay they would protect him by taking care of the problem. Jay relied on this promise, and died as a result." Appellants' Br. p. 26. Deputy Warren's "promise," according to the Seversons, created a special relationship such that the "government" was required to "affirmatively protect [Jay] against the violation of his" constitutional rights by Eskew. Appellants' Br. p. 27. In support of their argument, the Seversons cite *Archie v. City of Racine*, 826 F.2d 480, 497 (7th Cir.) (*Archie I*), *vacated and reh'g granted by* 831 F.2d 152 (7th Cir.1987). The Seventh Circuit, in *Archie I*, held that a special relationship was created between an ambulance dispatcher and a caller, who was suffering from hyperventilation. The dispatcher advised the caller to breathe into a bag and did not send an ambulance. *Id.* The caller arguably relied on the advice, causing her to refrain from seeking further assistance, and died. *Id.*

However, the Seventh Circuit overturned in part *Archie I* in an en banc rehearing of the case. *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988) (*Archie II*). *Archie II* held that the dispatcher did not violate the caller's rights under the Due Process Clause because the dispatcher did not cause the caller's disease, did not propel the caller into danger, and did not hinder the caller from seeking other sources of aid. *Id.* at 1223. Likewise, none of the defendants caused Eskew to murder Jay. Nor did they restrict Jay from taking any actions he felt were necessary to protect himself. As a result, the trial court correctly ruled in favor of the defendants on the Seversons' claim that a special relationship existed between the defendants and Jay.

In addition, the Seversons claim that Jay was a police informant and entitled to protection from the law enforcement authorities he was assisting in that capacity. Appellants' Br. p. 28. They purport to rely on a number of cases for the proposition that a law enforcement agency's failure to provide protection promised to an informant constitutes a breach of duty. Appellants' Br. p. 28. (citing *Monfils v. Taylor*, 165 F.3d 511 (7th Cir.1998); *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir.1998); *Wallace v. Adkins*, 115 F.3d 427 (7th Cir.1997); *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996); *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir.1995); *Dwares v. City of New York*, 985 F.2d 94 (2d Cir.1993); *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir.1990)). As the Tippecanoe County defendants correctly point out, none of the cases cited by the Seversons involved law enforcement promises to protect confidential informants. Tippecanoe County Appellees' Br. p. 13. Therefore, they have failed to show that the trial court erred to the extent it ruled in favor of the defendants on the Seversons' police-informant theory of liability.

### 3. Conclusion

In general, a private citizen does not have a constitutional right to be protected from violence committed by another citizen. The exceptions to this general rule—the "state-created danger" and "special relationship" exceptions—are not applicable in the instant case. The defendants did not compel Eskew to murder Jay. Nor was there any evidence that the defendants took affirmative steps to place Jay within Eskew's murderous path and then remove any means by which Jay might have protected himself. For these reasons, the Seversons have failed to designate any evidence showing that the defendants deprived Jay or them of their rights to substantive due process. The trial court, therefore, did not err by granting summary judgment on the § 1983 claims to: (1) the members of the Purdue University Board of Trustees for actions taken in their official capacities subject to prospective relief; (2) Purdue employees Sautter, Boscher, Johnson, and Lewis; (3) PUPD Officers Cox and Davis; and (4) Tippecanoe County Sheriff's Deputy Warren.

### III. Defenses to the Seversons' State Law Claims

#### A. No Duty

The Seversons further argue that the trial court erred to the extent that it determined that none of the defendants owed a duty of care to Jay. The duty of care, according to the Seversons, arises from two sources: (1) Purdue University, as a premises owner, owed a duty of care to the tenants of its residence halls; and (2) each defendant owed a duty of care to Jay through a gratuitous assumption of duty.

#### 1. No Premises Liability

In arguing for Purdue's liability as premises owner, the Seversons rely on three supreme court decisions handed

down on the same day: *L.W. v. Western Golf Ass'n*, 712 N.E.2d 983 (Ind.1999); *Vernon v. Kroger Co.*, 712 N.E.2d 976 (Ind.1999); and *Delta Tau Delta v. Johnson*, 712 N.E.2d 968 (Ind.1999). The issue in each case was whether the premises owner owed a duty to the plaintiff to protect the plaintiff from third-party criminal attacks. A duty arises when the totality of the circumstances demonstrates that the criminal act was reasonably foreseeable. *Vernon*, 712 N.E.2d at 979. To determine whether the totality of the circumstances supports imposition of a duty:

> a court must look to 'all of the circumstances surrounding an event, including the nature, condition, and location of the land, as well as prior similar incidents, to determine whether a criminal act was foreseeable.' 'A substantial factor in the determination of duty is the number, nature, and location of prior similar incidents, but the lack of prior similar incidents will not preclude a claim where the landowner knew or should have known that the criminal act was foreseeable.' While landowners have no duty to insure [their] invitee's safety, they do have a duty to take reasonable precautions to prevent foreseeable criminal acts against invitees.

*Id.* at 979–80 (citations omitted) (quoting *Delta Tau Delta*, 712 N.E.2d at 972, 973). We note that "a governmental unit is bound by the same duty of care as a nongovernmental unit except where the duty alleged to have been breached is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) that it should be treated as one as well." *Benton v. City of Oakland City*, 721 N.E.2d 224, 230 (Ind.1999).

Two supreme court opinions lead to the conclusion that no premise liability arose in the instant case: *Ellis v. Luxbury Hotels, Inc.*, 716 N.E.2d 359 (Ind.1999), and *Western Golf Ass'n*, 712 N.E.2d 983. In *Ellis*, a hotel clerk gave a husband his wife's room number without her knowledge or consent. 716 N.E.2d at 360. The husband proceeded to the room where he assaulted the man in the room with his wife. *Id.* Our supreme court held that the unforeseeable nature of the attack and lack of prior similar incidents led to the conclusion that no duty existed. *Id.* at 361. Likewise, in *Western Golf Ass'n*, summary judgment was appropriate because the absence of prior violent acts and sexual assaults at a fraternity house led to the conclusion that a rape was not reasonably foreseeable at the house. 712 N.E.2d at 985.

Summary judgment on the Seversons' negligence-based claims was appropriate for similar reasons. First, the Seversons designated no evidence showing any prior violent acts committed by student-residents against their resident advisors. Second, there was no designated evidence that would have made the murder of any residential advisor, including Jay, foreseeable. This leads us to conclude that Jay's murder was not reasonably foreseeable and that Purdue as the premises owner had no duty to protect against the harm suffered. Therefore, the Seversons have failed to show that the trial court incorrectly granted Purdue summary judgment on their negligence-based claims.

*2. No Gratuitous Assumption of Duty*

Citing *American Legion Pioneer Post No. 340 v. Christon*, 712 N.E.2d 532 (Ind.Ct.App.1999), *trans. denied*, the Seversons maintain that Purdue University, PUPD Officers Cox and Davis, Tippecanoe County Sheriff's Deputy Warren, and their respective law enforcement agency employers gratuitously assumed a duty to protect Jay. In *Christon*, this court held that a private security guard's attempt to

determine whether a partygoer was armed presented a genuine issue of material fact regarding whether the security company gratuitously assumed the duty to protect the attendees at the party. *Id.* at 537. According to the Seversons, the law enforcement officers and agencies gratuitously assumed a duty through Deputy Warren's statement that he would "take care of" the situation. Appellants' Br. p. 35. Purdue, furthermore, gratuitously assumed a duty by placing Jay in the residence hall and requiring him to report crimes committed by students, "even while living among" the students. Appellants' Br. p. 34. The Seversons further argue that Jay relied on the Purdue staff to remove dangerous students like Eskew from the residence hall, especially given that Purdue officials "were aware of the drug use and unstable mental state of" Eskew. Appellants' Br. p. 35.

 For an actor to gratuitously assume a duty, "[i]t is apparent that the actor must specifically undertake to perform the task he is charged with having performed negligently, for without actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully." *Butler v. City of Peru,* 733 N.E.2d 912, 917 (Ind.2000). The Seversons have designated no evidence that the law enforcement officers knew of a need to protect Jay or received a request from Jay for protection, *let alone that they promised to protect Jay from Eskew.* First, the Seversons' allegations that the "floor was abuzz" with rumors of Eskew's threat are insufficient to permit a reason-

able inference that the law enforcement officers heard these purported rumors. *See* Appellants' Br. p. 14 ("These officers were certainly in a position to hear these conversations, and most likely did become aware of the death threat by overhearing student conversations as they investigated he incident in question."). Similarly, the fact that Jay spent "a substantial amount of time with the law enforcement officers on the evening of October 15" is insufficient to support a reasonable inference that he informed the officers of a threat to his life. *See* Appellants' Br. p. 14. Speculation of this kind does not create a genuine issue of material fact. Furthermore, there is no evidence of drug-related violence at the residence hall or acts of violence against any residential advisor. Hence, Purdue employees could not have specifically undertaken to protect Jay from Eskew because they had no knowledge that Jay had been threatened.[6]

In sum, the Seversons designated no evidence showing that any defendant specifically undertook to protect Jay from Eskew. *See Butler,* 733 N.E.2d at 917. The trial court, as a result, correctly granted summary judgment to the defendants on the Seversons' state law claims.[7]

### B. Indiana Tort Claims Act—Law Enforcement Immunity

 In the instant case, the law enforcement agencies and personnel are also immune under the Indiana Tort Claims Act (ITCA). A governmental entity is immune from a liability "if a loss results from":

---

6. While these facts and circumstances dictate our decision in this case, we recognize that Purdue University and other institutions of higher learning do have a responsibility to adequately train and support those they employ as residential advisors.

7. We note that Purdue conceded liability under the Worker's Compensation Act, asserting that Jay was working as a residential advisor when he was murdered. Today's opinion in no way bars the Seversons from seeking any relief still available under the Worker's Compensation Act.

(7) the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment[.]

Ind.Code § 34–13–3–3. Our supreme court has defined the scope of "enforcement" as: "limited to those activities in which a governmental entity or its employees compel or attempt to compel the obedience. of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof." *Mullin v. Mun. City of South Bend,* 639 N.E.2d 278, 283 (Ind. 1994) (citing *Quakenbush v. Lackey,* 622 N.E.2d 1284, 1287 n. 3 (Ind.1993)).

In *O'Bannon v. City of Anderson,* we found ITCA law-enforcement immunity applicable where police officers pursued a suspect into the plaintiff's home where the suspect had retreated uninvited. 733 N.E.2d 1, 2 (Ind.Ct.App.2000). The officers fired shots into the O'Bannon's home, searched her home, and seized her temporarily in the course of arresting the suspect. *Id.* O'Bannon sued the City of Anderson for negligent infliction of emotional distress, trespass, and illegal search and seizure. *Id.* We held that the ITCA immunized the police officers from liability because the officers were seeking to enforce the law when they pursued the suspect into O'Bannon's home. *Id.* at 3.

Likewise, the law enforcement officers in the instant case were seeking to enforce the law by arresting Eskew. Their failure to arrest Eskew before he attacked Jay is clothed with the same immunity as the police officers' pursuit in *O'Bannon.* Therefore, the trial court did not err in granting summary judgment to the law enforcement officers and agencies to the extent it determined that the ITCA immunized their enforcement of the law or failure to enforce the law.

*IV. Indiana Constitutional Claims*

 The Seversons further maintain that the trial court erred in granting summary judgment on their claims brought under Article I, Sections 1, 12, and 21 of the Indiana Constitution.[8] Their assertion is utterly devoid of argument explaining how their Indiana constitutional rights were violated. Nor have the Seversons cited a single case to support their position. As a consequence, their claims that the defendants violated theirs or Jay's various Indiana constitutional rights are waived. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring that appellate argument be supported by reasoning and case authority); *Shelby v. Truck & Bus Group Div. of Gen. Motors Corp.,* 533 N.E.2d 1296, 1299 (Ind.Ct.App.1989) (holding that

8. Article I, Section 1 of the Indiana Constitution provides:

WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the People; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the People have, at all times, an indefeasible right to alter and reform their government.

Article I, Section 12 of the Indiana Constitution provides:

All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay.

Article I, Section 21 of the Indiana Constitution provides:

No person's particular services shall be demanded, without just compensation. No person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered.

claims under Article I, Sections 12 and 20 of the Indiana Constitution were waived for failure to offer reasoned argument and adequate case support).

## V. The Seversons' Motion to Strike[9]

■ The Seversons maintain that the trial court erred in denying their motion to strike certain portions of Purdue's reply brief to the Seversons' motion in opposition to summary judgment, Purdue's supplemental designation of evidence, and certain portions of the Tippecanoe County defendants' reply brief to the Seversons' motion in opposition to summary judgment. The Seversons contend that the Purdue defendants and the Tippecanoe County defendants raised new issues in reply to the Seversons' motion in opposition to summary judgment.

Citing *Spudich v. Northern Indiana Public Service Co.*, 745 N.E.2d 281, 289 (Ind.Ct.App.2001), *trans. denied*, the Tippecanoe County defendants contend that, to the extent new issues were raised in the reply briefs, a trial court may grant summary judgment based on any legal theory. We agree that the Seversons have failed to show that they suffered more prejudice by any additional legal authority in the Tippecanoe County defendants' reply brief than they would have suffered had the trial court discovered the legal theories independently. *See Spudich*, 745 N.E.2d at 289. Furthermore, the Tippecanoe County defendants maintain that their original motion for summary judgment had already sought summary judgment against the Seversons' individual capacity claims as well as their claims as personal representatives on behalf of Jay's estate. The Seversons do not dispute this assertion nor does our review of the original motion for summary judgment give us reason to do so. *See* Appellants' App. p. 18–19. Moreover, the Seversons do not dispute that any additional evidentiary designations made by Purdue were identical to those already made by the Seversons. Accordingly, the Seversons have failed to show that the trial court improperly denied Seversons' motion to strike.

## VI. The Seversons' Motion to Seal Portions of Appellate Record

■ In a motion filed separately from their briefs on appeal, the Seversons move this court to seal certain portions of the record. Specifically, the Seversons request this court to seal the photographs taken of Jay's dorm room after the murder and the identities of certain undercover law enforcement officers. Their motion indicates that all parties agreed to the sealing of these items at the trial court level. We hereby grant their motion to seal portions of the record.

## CONCLUSION

We conclude that Purdue and the PUPD were not § 1983 "persons." Therefore, the § 1983 claims against those parties are dismissed for lack of subject matter jurisdiction. The Seversons conceded that the § 1983 claims against the Office of the Sheriff of Tippecanoe County were properly disposed of by summary judgment. We decline to disturb that judgment.

As for the defendants amenable to § 1983 claims, the Seversons have failed to designate any evidence showing that the defendants deprived Jay or them of their rights to substantive due process. More specifically, the Seversons failed to desig-

---

9. Because we have determined summary judgment was appropriately entered in favor of all the defendants on all the Seversons' claims, we need not address the trial court's decision to deny both the Purdue defendants' and Tippecanoe County defendants' respective motions to strike.

nate evidence creating a genuine issue of material fact regarding the "state-created danger" and "special relationship" exceptions. The trial court, therefore, did not err in granting summary judgment on the § 1983 claims to: (1) the members of the Purdue University Board of Trustees for actions taken in their official capacities subject to prospective relief; (2) Purdue employees Sautter, Boscher, Johnson, and Lewis; (3) PUPD Officers Cox and Davis; and (4) Tippecanoe County Sheriff's Deputy Warren.

Similarly, Purdue did not owe Jay a duty of care by virtue of premises liability. Nor did any defendant gratuitously assume a duty to protect Jay from Eskew. The police officers and agencies involved in investigating Eskew's cocaine possession were immune from any liability through ITCA law-enforcement immunity. Finally, the Seversons waived any argument that the defendants violated Jay's or their Indiana constitutional rights. As a result, we affirm the summary judgment granted to each defendant on all of the Seversons' state law claims.

The trial court also properly denied the Seversons' motion to strike. We grant the motion to seal portions of the appellate record as requested.

We affirm in part, reverse in part, and remand for entry of dismissal of the § 1983 claims against Purdue and the PUPD.

VAIDIK, J., and BARNES, J., concur.